**AKZO COATINGS, INC., et al., Plaintiffs,**

v.

**AIGNER CORP., et al., Defendants.**

**No. S91–570M.**

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 19, 1994.

---

Timothy W. Woods, Jones Obenchain Ford Pankow and Lewis, South Bend, IN, Gary R. Letcher, Timothy L. Harker, Colleen M. Morgan, The Harker Firm, Washington, DC, for Akzo Coatings, Inc., O'Brien Corporation.

Pierre C. Talbert, Jr., Christopher W. Brownell, Foley and Lardner, Chicago, IL, for Aigner Corp., Duplicolor Products Co., Graham Paint & Varnish Co., Inc., Illinois Bronze Paint Co., Motorola, Inc., Prefinish Metals, Inc., Reynolds Metals Co., S & C Elec. Co., American Can Co., Sherwin Williams Co., Whittaker Corp.

Pierre C. Talbert, Jr., Foley and Lardner, Chicago, IL, for Dexter Corp.

James H. Milstone, Thorne Grodnik Ransel Duncan Byron and Hostetler, Elkhart, IN, Philip B. McKiernan, Hackman McClarnon Hulett and Cracraft, Indianapolis, IN, for IVC Industrial Coatings, Inc.

Richard W. Paulen, Barnes and Thornburg, Elkhart, IN, Pierre C. Talbert, Jr., Christopher W. Brownell, Foley and Lardner, Chicago, IL, for Roll Coater.

David M. Brooks, L. Michael Koch, Matthew R. Clark, Clark Quinn Moses and Clark, Indianapolis, IN, for Vista Products, Inc.

Robert C. Mitchell, Morton Intern. Inc., Chicago, IL, Christopher W. Brownell, Foley and Lardner, Chicago, IL, Thomas T. Terp, Robert A. Bilott, Taft Stettinius and Hollister, Cincinnati, OH, for Bee Chemical Co.

Timothy J. Abeska, Jeanine M. Gozdecki, Roemer and Mintz, South Bend, IN, James R. Morrin, Leo P. Dombrowski, Wildman Harrold Allen and Dixon, Chicago, IL, for CFC Intern., Inc., Coated Film Co.

*MEMORANDUM AND ORDER*

MILLER, District Judge.

This cause comes before the court on the motions of the RD/RA Settling Defendants [1] for partial summary judgment on Count 1 of their complaint on the issue of liability and for leave to file a statement of genuine issues instanter, and the motions of plaintiffs Akzo Coatings, Inc. ("Akzo") and O'Brien Corporation ("O'Brien") for summary judgment and for oral argument. For the reasons that follow, the court finds that the RD/RA Settling Defendants' motion for leave to file a statement of genuine issues instanter must be granted, their motion for partial summary judgment on Count 1 as to liability must be denied, and the plaintiffs' motion for summary judgment must be granted in part and denied in part.

I.

As a preliminary matter, the court must address the RD/RA Settling Defendants' motion for leave to file a statement of genuine issues instanter. The RD/RA Settling Defendants filed a motion for partial summary judgment and, in compliance with District Rule 56.1, included a statement of material facts that they contend are not in dispute. The plaintiffs responded to this motion by filing, among other things, a statement of genuine issues setting forth the material facts which they contend are disputed; the plaintiffs also filed a cross-motion for summary judgment with a separate statement of material facts. The RD/RA Settling Defendants contested the cross-motion on its merits, but did not include a statement of genuine issues. Thus, the plaintiffs contend that for purposes of their motion for summary judgment, all the facts set forth in their statement of material facts must be taken as true.

■ Although the court does not find District Rule 56.1 "ill-suited" to cases where cross-motions for summary judgment have been filed, the court understands the RD/RA

Settling Defendants' confusion over the need to file a statement of genuine issues. To prevent any further confusion, the court underscores that each summary judgment motion is separate and distinct, and must be addressed as such.

■ Nevertheless, the plaintiffs have not been prejudiced by the RD/RA Settling Defendants' failure to file a statement of genuine issues. The RD/RA Settling Defendants confronted the plaintiffs' summary judgment motion on its merits, and identified the facts that they contend are disputed. The plaintiffs addressed the contested facts in their reply brief, neither party would be prejudiced unduly by allowing the RD/RA Settling Defendants' to file a statement of genuine issues instanter.

Accordingly, the court grants the RD/RA Settling Defendants' motion for leave to file a statement of genuine issues instanter.

II.

A.

From 1970 to 1986, Fisher–Calo Chemicals and Solvent Corporation ("Fisher–Calo") collected, stored, and reclaimed used industrial solvents, waste paints, and other waste materials at the Kingsbury Industrial Park in LaPorte County, Indiana (the "Site"). Since the mid–1970's, the Site has been the subject of investigations by the United States Environmental Protection Agency ("EPA") and the Indiana State Board of Health, both of which have found numerous violations in the handling and storage of hazardous wastes at the Site. In 1983, the EPA designated the Site as a Superfund site pursuant to 42 U.S.C. § 9605, and in 1985, the EPA began a remedial investigation and feasibility study to select the most cost effective cleanup measures.

In December 1988, the EPA issued an administrative order ("AO") pursuant to 42 U.S.C. § 9606 addressing the hazardous sub-

---

**1.** The RD/RA Settling Defendants are Aigner Corp., American National Can Co., The Dexter Corp., Duplicolor Products Co., Graham Paint & Varnish Co., Inc., Illinois Bronze Paint Co., Motorola, Inc., Prefinish Metals, Inc., Reynolds Met- als Co., Roll Coater, Inc., S & C Electric Co., Sherwin Williams Co., Valspar, Inc., Whittaker Corp., and Morton International, Inc., on behalf of Bee Chemical Co.—Lansing & Armstrong Products.

stances treated or disposed of at the Fisher–Calo Two–Line Road facility. The AO initially identified thirteen potentially responsible parties ("§ 106 PRPs"); amendments added another twelve. The AO required the § 106 PRPs to develop a plan to sample and remove hazardous waste drums and dispose of contaminated soils. Most § 106 PRPs, including Akzo and O'Brien, agreed to finance and implement the measures required in the AO. To that end, the § 106 PRPs signed a cost-sharing and allocation agreement, which included a provision that they would not sue each other for cleanup costs incurred as a result of implementing the AO's requirements. By December 1991, these § 106 PRPs had incurred $6 million in costs.

In October 1990, the EPA notified approximately 200 additional companies ("RD/RA PRPs") that they were liable for past, present, and future cleanup measures required by the Record of Decision. Thirty-five of these RD/RA PRPs entered into a cost-sharing and allocation agreement to finance some of the cleanup measures. In August 1991, the EPA and the State of Indiana entered into a consent decree with the RD/RA Settling Defendants and other parties, which provided that the RD/RA Settling Defendants and others would finance and implement a $40 million cleanup project and pay the EPA $3.1 million for past cleanup costs. On December 30, the consent decree was lodged with the court in *United States v. Accurate Partitions Corp., et al.,* Cause No. S91–646M (N.D.Ind.). The consent decree required the defendants to undertake investigation and remedial action at the Space Leasing facility, the One–Line Road facility, the New Plant Life facility, the Two–Line Road facility, and "Mt. Fisher". Akzo and O'Brien were not parties to the consent decree.

### B.

Fisher–Calo began solvent recycling operations at the One–Line Road facility in 1972, whereby Fisher–Calo received dirty solvents from various customers and fed the dirty solvents into a still. Two products came out of the still—clean solvents and distillate bottoms waste ("stillbottoms"). Fisher–Calo sold the clean solvents, and stored the stillbottoms in fifty-five gallon drums outside the plant. During the Site's existence, more than 250 companies sent six million gallons of used solvents and other wastes to the Site for reclamation and reuse. In 1978, a fire destroyed the One–Line Road facility. Three years later, in October 1981, Fisher–Calo began a new solvent recycling operation at the Two–Line Road facility.

Akzo and O'Brien manufacture paints; they use solvents to clean paint off their manufacturing equipment. These used solvents become contaminated with paint and must be recycled to remove the dissolved paint contaminants. Used solvents generated by Akzo were delivered to Fisher–Calo for recycling from February 1982 to August 1984. Used solvents generated by O'Brien were delivered to Fisher–Calo for recycling from October 1981 to September 1984. Akzo and O'Brien arranged with Fisher–Calo for Fisher–Calo to transport, store, and reclaim the solvents at the Site. Fisher–Calo then transported the reclaimed solvent back to Akzo and O'Brien. Akzo and O'Brien contend that wastes generated from their used solvents were stored temporarily at the Two–Line Road facility in a large storage tank, and shipped offsite periodically for use as a fuel supplement. The RD/RA Settling Defendants contend that stillbottoms generated at the Two–Line facility were stored in fifty-five gallon drums, and in storage tanks located on the premises of the Two–Line and One–Line facilities.

The RD/RA Settling Defendants seek partial summary judgment on Count 1 of their complaint regarding the issue of liability. They contend that the wastes of Akzo and O'Brien were released into the soil and groundwater throughout various facilities at the Site. Akzo and O'Brien seek summary judgment, contending that their wastes did not contribute to any harm at the Site.

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. If that showing is made and the motion's opponent would bear the burden at trial on

the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent.

The parties cannot rest on mere allegations in the pleadings, or upon conclusory allegations in affidavits. The court must construe the facts as favorably to the non-moving party as the record will permit, and draw any permissible inferences from the materials before it in favor of the non-moving party, as long as the inferences are reasonable. The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law.

*Conery v. Bath Associates,* 803 F.Supp. 1388, 1392–93 (N.D.Ind.1992) (citations omitted).

### III.

■ Congress enacted CERCLA to remedy environmental problems caused by negligent hazardous waste disposal practices, and created a private cause of action to recover from responsible parties the costs of responding to hazardous waste conditions. *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. 1448, 1455 (N.D.Ind.1990); 42 U.S.C. § 9607(a). CERCLA imposes liability on, among others, "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person ... at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). Such persons are liable for any necessary response costs incurred by any other person which are consistent with the national contingency plan. 42 U.S.C. § 9607(a)(4)(B). To hold a person liable as a generator of hazardous waste, the person must be shown to have (1) arranged for the disposal of hazardous substances, (2) at a

facility which now contains hazardous substances of the sort disposed of by the person, (3) that there have been releases of hazardous substances from the facility, and (4) that these releases caused the incurrence of response costs. *City of New York v. Exxon Corp.,* 744 F.Supp. 474, 480 (S.D.N.Y.1990); *Violet v. Picillo,* 648 F.Supp. 1283, 1289–90 (D.R.I.1986).

### IV.

■ In Count I of their counterclaim—the only count on which they have moved for partial summary judgment[2]—the RD/RA Settling Defendants seek recovery of all their response costs under 42 U.S.C. § 9607(a). The RD/RA Settling Defendants contend that Akzo and O'Brien arranged for the disposal or treatment of hazardous substances at the Site, that the Site is a facility which contains hazardous substances of the kind contained in Akzo's and O'Brien's wastes, and that there have been releases and threatened releases of hazardous substances at the Site which have caused, or will cause, the RD/RA Settling Defendants to incur response costs. Section 9607(a) provides for joint and several liability unless there is a reasonable basis to apportion the harm. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 267–71 (3rd Cir.1992); *Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 691 F.Supp. 1100, 1115–18 (N.D.Ill.1988). Thus, the RD/RA Settling Defendants seeks to hold Akzo and O'Brien jointly and severally liable for the total response costs incurred by the RD/RA Settling Defendants in remediating the Site.

Akzo and O'Brien contend that the RD/RA Settling Defendants are not entitled to partial summary judgment on count 1 because, among other reasons, "their counterclaims are for contribution of all of their response costs, and as a matter of law Akzo and O'Brien cannot be jointly and severally liable in contribution and cannot be liable for all of the response costs." In essence, Akzo and O'Brien argue that because the RD/RA Settling Defendants are liable parties, the only

---

**2.** *See* RD/RA Settling Defendants' Consolidated Reply, p. 7 ("The RD/RA Settling Defendants' contribution counterclaim under 42 U.S.C. § 9613(f)(1) (Count II) is not before the Court in these motions.").

claim available to the RD/RA Settling Defendants against other potentially responsible parties is a claim for contribution under § 9613(f). Akzo and O'Brien contend that the RD/RA Settling Defendants cannot bring a direct cost recovery claim for joint and several liability under § 9607(a) because the only action by one liable party against another allegedly liable party is an action for contribution. *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989). The court agrees.

The Seventh Circuit recently addressed the issue of contribution with respect to the action of Akzo and O'Brien against the RD/RA Settling Defendants. The court stated:

> That Akzo's claim is one for contribution we have no doubt. Akzo argues that its suit is really a direct cost recovery action brought under section 107(a) rather than a suit for contribution under section 113(f)(1); and it is true that section 107(a) permits any "person"—not just the federal or state governments—to seek recovery of appropriate costs incurred in cleaning up a hazardous waste site. 42 U.S.C. § 9607(a), subpart (B). Yet, Akzo has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a)—it is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands. Instead, Akzo itself is a party liable in some measure for the contamination at the Fisher–Calo site, and the gist of Akzo's claim is that the costs it has incurred should be apportioned equitably amongst itself and the others responsible. Complaint paras. 10, 11. That is a quintessential claim for contribution. *See Restatement (Second) of Torts* § 886A (1979); *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989); *In re Dant & Russell, Inc.*, 951 F.2d 246, 249 (9th Cir. 1991). Section 113(f)(1) confirms as much by permitting a firm to seek contribution from "any *other*" party held liable under sections 106 or 107. Whatever label Akzo

may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Akzo's suit accordingly is governed by section 113(f). *Accord Transtech Indus., Inc. v. A & Z Septic Clean*, 798 F.Supp. 1079, 1085–87 (D.N.J.1992), *appeal dismissed*, 5 F.3d 51 (3d Cir.1993), *cert. denied*, No. 93–960, —— U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994). To the extent cases such *Burlington N. R.R. Co. v. Time Oil Co.*, 738 F.Supp. 1339, 1342–43 (W.D.Wash.1990), and *Key Tronic Corp. v. United States*, No. C 694–JLQ, Order at 15 (E.D.Wash. Aug. 9, 1990), *judgment rev'd on other grounds*, 984 F.2d 1015 (9th Cir.), *aff'd in part, rev'd in part, and remanded*, —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), have suggested otherwise, we decline to follow them.

*Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764–765 (7th Cir.1994).

This motion involves a reciprocal claim: the RD/RA Settling Defendants are parties liable in some measure for the contamination at the Fisher–Calo site, and the gist of their counterclaim is that the costs they have incurred should be apportioned equitably amongst themselves and the others responsible parties—Akzo and O'Brien. As the Seventh Circuit stated "[t]hat is a quintessential claim for contribution." *Id.* at 764.

Accordingly, the RD/RA Settling Defendants cannot hold Akzo and O'Brien jointly and severally liable for all the response costs that the RD/RA Settling Defendants have incurred or may incur. Because the RD/RA Settling Defendants have moved for partial summary judgment only as to count 1, which seeks recovery of all their response costs under 42 U.S.C. § 9607(a), their motion for partial summary judgment must be denied.[3]

## V.

### A.

Although CERCLA does not mandate the imposition of joint and several liability,

---

**3.** Alternatively, joint and several liability would be inappropriate because, as will be shown below, the harm at the Site is divisible based upon the geographic location of the hazardous waste.

*See Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1552 (W.D.Mich.1989) (any liability under § 107(a) is joint and several except where the harm is shown to be divisible).

CERCLA permits it in cases of indivisible harm at a site. Applying common law rules, courts have held that if two or more persons act independently to cause a single harm for which there is a reasonable basis for apportionment according to each person's contribution, then each person is held liable under CERCLA for only that portion of the harm he caused. *United States v. Alcan Aluminum Corp.*, 964 F.2d at 267–71; *United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Arizona v. Motorola, Inc.*, 805 F.Supp. 749, 752 (D.Ariz.1992). Courts have applied the principles enunciated in the *Restatement (Second) of Torts* in determining whether the costs of remediating environmental harm at a site should be apportioned. *See, e.g., United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2nd Cir.1993); *United States v. Alcan Aluminum Corp.*, 964 F.2d at 268–69; *United States v. Monsanto Co.*, 858 F.2d at 171; *Arizona v. Motorola*, 805 F.Supp. at 752; *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 811 (S.D.Ohio 1983).

Section 433A of the *Restatement* provides:

(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

*Restatement (Second) of Torts* § 433A (1965).

Section 881 of the *Restatement* sets forth the affirmative defense based upon Rule § 433A:

If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.

*Restatement (Second) of Torts* § 881 (1965).

■ If Akzo and O'Brien can establish that the harm at the Site is capable of reasonable apportionment, then they should be held liable only for the response costs relating to that portion of harm to which they contributed. *United States v. Alcan Aluminum Corp.*, 964 F.2d at 271. Akzo and O'Brien bear the burden of proving that the harm is capable of apportionment. *United States v. Alcan Aluminum Corp.*, 990 F.2d at 722 ("the polluter bears the ultimate burden establishing a reasonable basis for apportioning liability"); *United States v. Alcan Aluminum Corp.*, 964 F.2d at 269; *United States v. Monsanto Co.*, 858 F.2d at 172; *Arizona v. Motorola*, 805 F.Supp. at 752; *United States v. Chem–Dyne Corp.*, 572 F.Supp. at 811; *Restatement (Second) of Torts* § 433B(2) (1965).[4] Moreover, if Akzo and O'Brien can establish that they have not caused or contributed to the release of hazardous substances at the Site, or the resultant response costs, they should not be held liable for any of the response costs. *United States v. Alcan Aluminum Corp.*, 964 F.2d at 271.

■ Akzo and O'Brien contend that the harms at the Site are divisible based upon their location, the time that the harms were caused, and the chemical constituents of the contamination. The court agrees that the harm is divisible based upon geographic location. Both sides have presented numerous maps that have aided the court in determining that the Site as a whole is divisible based upon location of the hazardous waste. Within the Site as a whole, a number of noncontiguous areas of contamination appear, including seven distinct areas of soil contamination, three distinct areas of groundwater contamination, and two distinct areas of suspected buried drums.

The Two–Line Road facility is a cluster of buildings, tanks, equipment, and grounds at the north end of Two–Line Road. There are three distinct areas of contamination at the

---

4. Section 433B(2) provides:

Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

Two–Line Road facility: (1) a 500 cubic yard pocket of soil contaminated with PCBs; (2) an estimated 12,600 cubic yard mound of soil contaminated with semi-volatile organic compounds about 300 yards northeast of the recycling plant (referred to as "Mt. Fisher"); and (3) a plume of contaminated groundwater possibly caused by the contaminated soil of Mt. Fisher.

The New Plant Life facility is a cluster of buildings and grounds at the south end of Two–Line Road, about one-half mile from the Two–Line Road facility. The New Plant Life facility contains two areas of soil contamination—a 7,000 cubic yard pocket of soil contaminated with VOCs, and a 500 cubic yard pocket of soil contaminated with PCBs.

The One–Line Road facility is located about three-fourths of a mile from the Two–Line Road plant, and consists of a plume of contaminated groundwater, three separate pockets of contaminated soil, and an area of suspected buried drums and waste materials.

The National Products facility is a cluster of buildings located at the north end of One–Line Road, about one-half mile from the Two–Line Road plant. The National Products facility contains a plume of groundwater contamination.

The Space Leasing Facility is two miles east of the Two Line facility, and contains an area of soil contamination.

The RD/RA Settling Defendants have presented no cogent reason why the Site, as a whole, cannot be divided into the foregoing areas of contamination. Given that each area of contamination is separate and, more importantly, non-contiguous, the court finds that the site is divisible based upon the geographic location of the harm.

### B.

Before addressing the merits of the plaintiffs' summary judgment motion, the court must address plaintiffs' objections to the testimony or affidavits of Mark Ludlow, Jann Fisher, and Dr. Konrad Banaszak.

### 1.

■ Admissibility of evidence submitted with a motion for summary judgment is a question governed by federal law. *Roloff v. Sullivan*, 772 F.Supp. 1083, 1088 (N.D.Ind. 1991), *aff'd*, 975 F.2d 333 (7th Cir.1992). Statements supporting a party's position on summary judgment that are based on hearsay rather than personal knowledge are not permissible in a Rule 56(e) affidavit. *Roloff v. Sullivan*, 772 F.Supp. at 1088 (citing *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n. 4 (7th Cir.1989)).

■ A court deciding a summary judgment motion should not rely on unauthenticated documents filed as addenda to the motion. *Vukadinovich v. Board of School Trustees*, 776 F.Supp. 1325, 1326 (N.D.Ind. 1991), *aff'd*, 978 F.2d 403 (7th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 133, 126 L.Ed.2d 97 (1993); *Roloff v. Sullivan*, 772 F.Supp. at 1088. "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e), and the affiant must be a person through whom the exhibits could be admitted into evidence." *Vukadinovich v. Bd. of School Trustees*, 776 F.Supp. at 1327 (citing 10A C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure* § 2722 (2d ed. 1983)). An affidavit submitted in connection with a summary judgment motion which is based upon documents or reports received by the affiant, but about which the affiant has no personal knowledge, contain inadmissible hearsay. *Roloff v. Sullivan*, 772 F.Supp. at 1088 (citing *Friedel v. City of Madison*, 832 F.2d 965 (7th Cir.1987)).

### 2.

■ Akzo and O'Brien object to portions of Sgt. Mark Ludlow's deposition testimony. Sgt. Ludlow, who was formerly a LaPorte County Hazardous Materials Coordinator, testified that he participated in an investigation of the Two–Line Road facility in 1983. During the course of that investigation, a confidential informant notified Sgt. Ludlow that (1) drums of stillbottoms from the Two–Line Road premises were placed in trailers around the Site (the New Plant Life and Wallace Warehouse premises) to avoid detection by regulatory agencies; (2) stillbottoms from the Two–Line Road premises were transported in tanker trucks to the Cardinal

Chemical premises; and (3) waste material was placed in a tanker truck affixed with a spray device and sprayed on roads within the Site. Sgt. Ludlow inspected the road after an instance of spraying was rumored to have occurred, and confirmed that spraying had occurred.

Akzo and O'Brien contend that Sgt. Ludlow's testimony with respect to what the confidential informant told him constitutes inadmissible hearsay. The RD/RA Settling Defendants contend that the testimony is admissible pursuant to the residual hearsay exceptions found in Rules 803(24) or 804(b)(5) of the Federal Rules of Evidence. Those rules provide that the following is not excluded by the hearsay rule:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, *including the name and address of the declarant.*

Fed.R.Evid. 803(24) and 804(b)(5) (emphasis added).[5]

Admissibility under the residual exception established by Rule 803(24) requires that "the statement must be sufficiently trustworthy, material, probative, in the interests of justice, and given to opposing parties with the proper notice." *Amcast Indus. Corp. v. Detrex Corp.,* 779 F.Supp. 1519, 1527

(N.D.Ind.1991), *aff'd in part, rev'd in part, remanded,* 2 F.3d 746 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994).

The RD/RA Settling Defendants have not complied with the notice requirements of Rules 803(24) or 804(b)(5) because they have not provided Akzo or O'Brien with the name and address of the declarant—in this case, the confidential informant. On that basis alone, the confidential informant's statements, as related by Sgt. Ludlow, are not admissible under Rule 803(24) or 804(b)(5). Even if the court afforded the RD/RA Settling Defendants some leeway and considers the question of the statements' admissibility under the remaining tests, *see Amcast Indus. Corp. v. Detrex Corp.,* 779 F.Supp. at 1527, the confidential informant's statements still would not be admissible.

Although district courts have considerable discretion in applying the residual exception, *United States v. Mokol,* 939 F.2d 436, 438 (7th Cir.1991), the exception is "intended to be used rarely, and only in exceptional circumstances." *United States v. Moore,* 791 F.2d 566, 573 (7th Cir.1986); *Amcast Indus. Corp. v. Detrex Corp.,* 779 F.Supp. at 1527.

> Among the factors considered in determining whether to apply the residual exception are the declarant's disinterest, the declarant's motivation to lie, whether the statement was made under oath, the declarant's probable motivation in making the statement, the extent of the declarant's personal knowledge of the events recounted in the statement, the probable accuracy of the witness's recounting of the declarant's statement, a testifying witness's knowledge of the statement's contents, the declarant's age, the declarant's character for truthfulness and honesty, the frequency with which the declarant made similar statements, whether the declarant recanted the statement, the statement's temporal proximity to the event related, and the existence of sufficient corroborative evidence.

---

5. "Rule 804(b)(5) is identical to Rule 803(24) with the exception of the additional requirement that the declarant be unavailable. Thus cases decided under Rule 804(b)(5) are significant authority with respect to Rule 803(24) and vice versa." Michael Graham, *Handbook of Federal Evidence,* § 803.24 (3rd ed. 1991).

*Amcast Indus. Corp. v. Detrex Corp.*, 779 F.Supp. at 1527–28 (citations omitted).

■ There is a such a tremendous lack of information regarding Sgt. Ludlow's confidential informant that the court cannot determine whether his or her statements have any indicia of trustworthiness. The confidential informant was a Fisher–Calo employee. But there is no information with respect to the confidential informant's interest or disinterest in this matter, motivation to lie, motivation in making the statement, personal knowledge of the events recounted in the statement, or the confidential informant's age or character for truthfulness and honesty, the frequency with which the confidential informant made similar statements, or whether the confidential informant recanted the statement. Without at least some of this information, the court cannot evaluate the confidential informant's personal knowledge, general truthfulness, or consistent repetition. *Amcast Indus. Corp. v. Detrex Corp.*, 779 F.Supp. at 1528. Moreover, the confidential informant's statements were not made under oath, *see* Ludlow Dep., p. 71, and there is no indication that the confidential informant was subjected to cross-examination.

■ The RD/RA Settling Defendants contend that because a United States Magistrate Judge accepted the information as probable cause to issue a search warrant, the information should likewise be admissible in this case. For purposes of issuing a search warrant, however, "[t]he finding of probable cause may be based upon hearsay evidence in whole or in part." *See* Fed.R.Crim.P. 41(c)(1). No similar rule applies to summary judgment motions.

Accordingly, Sgt. Ludlow's testimony with respect to what he was told by the confidential informant about the Site is not admissible under Rule 803(24) or 804(b)(5).

### 3.

■ Akzo and O'Brien object to portions of Jann Fisher's second affidavit. From January 1982 through 1986, Ms. Fisher was the Solvent Reclamation Coordinator at Fisher–Calo. Akzo and O'Brien object to three exhibits attached to Ms. Fisher's second affidavit, as well as her affirmations which refer to the exhibits. The plaintiffs' objections are well-taken.

Akzo and O'Brien object to Exhibit A, a September 18, 1983 memorandum titled "Events leading up to E.P.A. inspection of Sept. 13th 1983", because (1) the document has not been authenticated, (2) the document was not prepared by Ms. Fisher or in the regular course of business, and (3) Ms. Fisher does profess personal knowledge of the document's contents. The court agrees. There is no indication who prepared the document or whether it was prepared in the regular course of business. Ms. Fisher does not claim that she has personal knowledge of the document's contents or of the events referred to in Exhibits B and C, letters dated June 7 and July 3, 1985; thus, the contents of those letters are inadmissible for purposes of the summary judgment motion.

### 4.

Akzo and O'Brien object to Dr. Banaszak's affidavit. Dr. Banaszak, an expert retained by the RD/RA Settling Defendants, affirmed that in his opinion there is no scientific basis to determine the contribution of a specific company's wastes to the soil and groundwater contamination at the Site. He also affirmed that there is no scientific basis to apportion the costs of remedying the environmental harm at the Site on the basis of a specific company's wastes. Finally, Dr. Banaszak opined that there is no scientific basis to determine the contributions of Akzo and O'Brien to the soil and groundwater contamination at the site, or to determine the contributions of Akzo and O'Brien to the soil and groundwater contamination in each of the study areas.

Akzo and O'Brien contend that Dr. Banaszak's affidavit should be stricken because (1) he fails to explain the reasoning behind his opinions, (2) his opinions lack a proper foundation, (3) he is not a cost analysis expert, and (4) the facts do not support Dr. Banaszak's opinion.

■ Facts and opinions stated in an expert's affidavit may be considered only if they would be admissible under the Federal Rules of Evidence. *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335, 1342

(S.D.Ind.1992), *aff'd*, 9 F.3d 607 (7th Cir. 1993). A court should exclude an expert's opinion if it is so fundamentally unsupported that it cannot help the factfinder. *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989). Whether an adequate basis supports an expert's opinion is a matter of law for the court to decide. *Porter v. Whitehall Laboratories*, 791 F.Supp. at 1348.

For example, in *Mid–State Fertilizer Co. Exchange National Bank*, 877 F.2d 1333 (7th Cir.1989), the court held that an economist's opinion, unsupported by any factual basis, did not create a question of fact sufficient to survive a motion for summary judgment. 877 F.2d at 1339–40. The expert in that case, however, "presented nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypothesis considered and rejected." 877 F.2d at 1339; *see also State Farm Fire & Casualty Co. v. Miles*, 730 F.Supp. 1462, 1472 (S.D.Ind.1990), *aff'd*, 930 F.2d 25 (7th Cir.1991) (summary judgment cannot be avoided by presenting conclusory testimony of an expert witness).

■ Dr. Banaszak's affidavit should not be stricken. Contrary to the plaintiffs' contentions, Dr. Banaszak's affirmations are material to this case, and he has laid a proper factual foundation for his opinion. Within the twenty-seven subparagraphs included in paragraph five of his affidavit, Dr. Banaszak states the factual bases underlying his opinions. He also includes a list of the documents that he reviewed to form his opinions. Thus, unlike the foregoing cases, there is a proper foundation for his opinions. At this stage in the proceedings, Dr. Banaszak need not explain his reasoning in such detail that his affidavit becomes a publication.

■ Akzo and O'Brien challenge the factual basis of Dr. Banaszak's opinions, as well as his credibility. At summary judgment, however, this court cannot resolve factual disputes or credibility; resolution of such issues must await trial. Finally, Akzo and O'Brien contend that Dr. Banaszak is not a cost analysis expert. The court does not perceive Dr. Banaszak as stating an expert opinion regarding the costs of remedial action; instead, the court believes he is stating his opinion as to the lack of a basis for dividing whatever costs are incurred in remediating the Site or the Site's study areas.

Accordingly, the court declines to strike Dr. Banaszak's affidavit.

### C.

Several separately identified locations comprise the Site: (1) the Two–Line Road facility (Study Area A); (2) the New Plant Life facility (Study Area B); (3) the One–Line Road facility (Study Area C); (4) the National Packaging facility (Study Area D); and (5) the Space Leasing facility (Study Area E). In addressing the plaintiffs' motion for summary judgment, each facility will be addressed in turn.

### 1.

*Fisher–Calo Two Line Road Facility (Study Area A).* The Two–Line Road facility is a cluster of buildings, tanks, equipment, and grounds at the north end of Two–Line Road. In October 1981, Fisher–Calo began a solvent recycling operation at the Two–Line Road facility, and carried on that operation until February 1985.

According to Akzo and O'Brien, three distinct and separate areas of contamination at the Two–Line Road facility remain: (1) a 500 cubic yard pocket of soil contaminated with PCBs; (2) an estimated 12,600 cubic yard mound of soil contaminated with semi-volatile organic compounds about 300 yards northeast of the recycling plant (referred to as "Mt. Fisher"); and (3) groundwater contamination possibly caused by the contaminated soil of Mt. Fisher. Under the consent decree in *United States v. Accurate Partitions Corp.*, the contaminated soil is to be excavated and incinerated, while the contaminated groundwater is to be extracted and treated.

■ Akzo and O'Brien contend that the used solvents that they generated did not contain PCBs, so they did not cause the 500 cubic yard pocket of soil to be contaminated with PCBs. The court agrees. Dr. Banaszak, an expert for the RD/RA Settling Defendants, affirmed that:

Still bottoms from the solvent reclamation process were commingled with still bottoms from the PCB waste reclamation pro-

cess at Fisher–Calo. Consequently, releases of still bottoms from the Two–Line Road facility operation cannot be distinguished on the basis of PCB and non-PCB waste.

See Banaszak Aff., p. 6. Dr. Banaszak does not state that the used solvents sent by Akzo or O'Brien contained PCBs; rather, he claims that the stillbottoms from the solvents may have been mixed with other stillbottoms which contain PCBs. The 500 cubic yard pocket of soil, however, contains only PCB contamination. See Remedial Design Work Plan, pp. 8–9, fig. 2.3, tables 2.4, 2.5, plaintiffs' reply appendix, pp. 407–411. Absent evidence that the used solvents of Akzo or O'Brien contained PCBs, they could not have caused the contamination associated with that specific pocket of contaminated soil.

▌ With respect to the 12,600 cubic yard mound of contaminated soil and the contaminated groundwater, Akzo and O'Brien maintain that in 1975, Glenn Swim & Son, a contractor, took between 700–1,000 drums of waste from the One–Line Road facility and buried them at what is now known as Mt. Fisher. The Swims punctured the drums, and the wastes discharged into the soil. In May 1979, the IDEM and EPA discovered that the soil was contaminated; a year later, Fisher–Calo excavated and removed the drums. In August–September 1981, the EPA identified a plume of contaminated groundwater flowing from where the drums had been buried. In 1986, 12,600 cubic yards of contaminated soil were excavated and placed on a plastic tarp adjacent to the excavation, where the soil currently remains. Akzo and O'Brien contend that the soil contamination at Mt. Fisher, as well as the groundwater contamination, occurred before they sent their used solvents to the Two–Line Road facility; thus, they claim that they cannot be held liable for the harm at the Two–Line Road facility.

The RD/RA Settling Defendants have produced much evidence indicating that there were a number of discharges around the facility during the period in which Akzo and O'Brien sent used solvent to the Two–Line Road facility. For example, Sgt. Ludlow stated that during inspection of the Two–Line Road facility in 1983, he observed spills from stored drums on fifteen to twenty occasions; he saw paint sludge on the ground on five to ten occasions; he saw leaking barrels and drums in the area of the Two–Line Road agitator; and he observed spillage from hoses laying on the ground near the back side of the production building.

Jeffrey Lee Johnson, a Fisher–Calo employee from 1980–83, testified that there was spillage of solvents around the Two–Line Road facility. He stated that tankers, barrels, and storage tanks were overfilled, resulting in spills of twenty, fifty, or one hundred gallons. Mr. Johnson testified that he saw leaking drums every day. Andris Rozite, the vice president and laboratory director of EIS Environmental Engineers, testified that EIS sampled the contaminated soil at the north end of Two–Line Road and found VOCs at all locations and testing depths. Finally, Dr. Banaszak affirmed that hazardous constituents present in wastes of Akzo and O'Brien were found in the soil and groundwater at the Two–Line Road facility. See Banaszak Aff., pp. 5–7.

There is a question of fact whether hazardous wastes found in used solvents of Akzo and O'Brien, which were sent to the Two–Line Road facility between 1981–85, were released into the 12,600 cubic yards of contaminated soil and the groundwater. Accordingly, summary judgment with respect to these areas within the Two–Line Road facility in not appropriate.

2.

▌ *New Plant Life Facility (Study Area B).* The New Plant Life facility is a cluster of buildings and grounds at the south end of Two–Line Road, which are occupied by NPL Inc., d/b/a New Plant Life. The New Plant Life facility is about half a mile from the Two–Line Road facility, and contains two areas of soil contamination: a 7,000 cubic yard pocket of soil contaminated with VOCs, and a 500 cubic yard pocket of soil contaminated with PCBs.

According to Akzo and O'Brien, after the 1978 fire at the One–Line Road facility, several thousand drums containing hazardous wastes were stored in and around the New

Plant Life buildings. Drums of hazardous waste connected with New Plant Life's operation also were stored in and around the buildings before their removal in 1991. Akzo and O'Brien contend that the court reasonably can infer that the contamination at the New Plant Life facility was caused by the storage of drums transferred from the One–Road Line facility or the drums stored by New Plant Life.

The RD/RA Settling Defendants submit evidence of a September 13, 1983 search of the New Plant Life facility by the Indiana Department of Environmental Management ("IDEM"), the Indiana Attorney General's office, the EPA, the Indiana State Police, and the LaPorte County Sheriff's Department. At that time, two Fisher–Calo van trailers were parked at one end of the premises. In one trailer, eighty-one drums of hazardous waste were observed and sampled. One drum label indicated that the waste was received by Fisher–Calo after February 1981; a hazardous waste manifest, combined with a Fisher–Calo receiving report, indicated that six drums of waste were received by Fisher–Calo in September 1981; another drum had a label that indicated that it was received by Fisher–Calo after November 2, 1982. The 170 drums in the trailers were leaking and there was a strong odor of solvent. Samples from the drums reveal that the drums contained hazardous wastes.

The RD/RA Settling. Defendants also contend that Jann Fisher, John McKie, Mark Riley, and Clayton Reed all testified that "drums of waste materials received at the Two–Line Road premises were stored at the New Plant Life premises prior to being processed at Two–Line." RD/RA Settling Defendants Consolidated Reply, p. 33.[6]

Exhibit C to Jann Fisher's second affidavit, even if admissible, does not indicate that waste materials were stored at New Plant Life before being processed at Two–Line

Road. *See* Second Fisher Aff., Exh. C, Att. 1, ¶ 2.a., app. Tab C.[7] Mr. McKie testified that he transported drums from the Two–Line Road premises to New Plant Life in the summer of 1982, but he stated that they were drums from the 1978 fire. *See* McKie Dep., at 212–216, 220–23, app. Tab L. He did not recall transporting drums of waste materials received at the Two–Line facility during the period that he worked there. *Id.*

Mark Riley testified that lacquer thinner was taken from the Two–Line Road facility and stored at New Plant Life. *See* Riley Dep. p. 191, app. Tab P. Clayton Reed affirmed that in the early 1980's, he saw hundreds, or possibly thousands, of drums stacked in rows within the New Plant Life garage, and that the garage smelled like paint thinner. *See* Reed Aff., ¶ 13, Tab N. Mr. Reed observed that ten to fifteen drums were leaking. *Id.* Akzo and O'Brien manufacture paints, and use solvents to clean paint off their manufacturing equipment. Akzo generated waste solvents and paint thinner, and arranged with Fisher–Calo to transport, store, and reclaim these materials. *See* RD/RA Settling Defendants Statement of Material Facts, p. 10. O'Brien sent at least one shipment of paint to the Fisher–Calo site. *Id.* at 12.

The court cannot weigh the evidence at this stage in the proceedings; instead, the court simply must construe the facts as favorably to the non-moving party as the record will permit, and draw any permissible inferences from the materials before it in favor of the non-moving party. Applying this standard, the court finds that there is evidence, and reasonable inferences which could be drawn therefrom, that hazardous waste material, similar to that delivered by Akzo and O'Brien to the Two–Line Road facility, was taken from the Two–Line Road facility and stored at New Plant Life during

**6.** The confidential informant told Sgt. Ludlow that in 1983 drums which were rusty, leaky, and disintegrating were taken from the Two–Line Road premises to New Plant Life. As stated above, however, Sgt. Ludlow's testimony about what the confidential informant told him about the Site is not admissible under Rule 803(24) or 804(b)(5).

**7.** The paragraph to which the RD/RA Settling Defendants cite provides that:

· At one time, Building Number 2 contained 3,000–3,500 drums which contained waste residues. This building was gradually emptied and is empty now. The drums at one time contained propylene and hazardous waste.

the early 1980's. There also is evidence that those wastes were released into the soil at New Plant Life.

Akzo and O'Brien contend that the substances they generated did not contain PCBs, which was the hazardous substance found in the 500 cubic yard contaminated pocket of soil. The RD/RA Settling Defendants do not contest this fact, nor do they indicate that the Akzo and O'Brien's products contains PCBs. *See* RD/RA Settling Defendants Statement of Material Facts, p. 25.

Accordingly, the plaintiffs' motion for summary judgment must be granted regarding the 500 cubic yard pocket of soil contaminated with PCBs. The court, however, must deny the summary judgment motion with respect to the 7,000 cubic yard pocket of soil contaminated with VOCs.

3.

■ *Cardinal Chemical/One–Line Road Facility (Study Area C).* The One–Line Road facility is located about three-fourths of a mile from the Two–Line Road plant, and contains (1) a plume of contaminated groundwater, (2) three separate pockets of contaminated soil, and (3) an area of suspected buried drums and waste materials.

When Fisher–Calo operated the One–Line Road facility, used solvents were stored in drums and tanks around the plant until they could be fed into a still. Reclaimed solvents from the still were stored in other tanks or drums until they were shipped to Fisher–Calo's customers. Before 1978, Fisher–Calo dumped stillbottoms and other waste into a pit southeast of the facility. The pit is identified as containing potentially buried waste materials, and also is a possible cause of groundwater contamination. By March of 1978, tens of thousands of drums containing waste solvents, sludges, and stillbottoms were stored in and around the One–Line Road facility.

A fire destroyed the One–Line Road plant in 1978. During the fire, many drums and tanks burst, discharging their contents onto the soil. In addition, firefighters showered millions of gallons of water onto the fire. The fire and its aftermath is a possible cause of the soil and groundwater contamination at the One–Line Road facility. After the fire, Fisher–Calo moved the remaining drums to the National Products, Two–Line Road, and New Plant Life facilities. All these events transpired before Akzo or O'Brien sent used solvents to the Two–Line Road facility.

Akzo and O'Brien contend that the substances they sent to the Two–Line Road facility were handled only at that facility; therefore, they did not cause any harm at the One–Line Road facility. They claim that the soil and groundwater contamination occurred because of the past practices of Fisher–Calo and the 1978 fire.

There is some evidence, however, that the solvents Akzo and O'Brien sent to the Two–Line Road facility were released at the One–Line Road facility. For example, Clayton Reed testified that in 1982 or 1983, a Fisher–Calo supervisor directed him to drain liquids from a 6,000 gallon tanker truck from the Two–Line Road operations onto the gravel roads behind the One–Line Road facility. Mr. Reed testified that the released liquids smelled like "paint thinner." Mr. Reed affirmed that on several occasions during the early 1980's, he observed Fisher–Calo employees pumping material out of tanker trucks into horizontal and vertical storage tanks on the One–Line Road premises. He stated that the tanker trucks involved were being used by Fisher–Calo in its solvent reclamations operations at the Two–Line Road facility. In early 1985, Mr. Reed was ordered to assist in cleaning up a spill from a vertical tank on the One–Line Road facility which he claims was used to store material from the Two–Line Road operations. He affirms that the spilled material ran all over the ground and, in spite of clean up efforts, not all of the soiled material was collected. Michael Sickels, Indiana State Board of Health, corroborated Mr. Reed's affirmations regarding the 1985 spill. Jeffrey Lee Johnson, a Fisher–Calo employee from 1980 to 1983, testified that he and other employees would "steam out" bulk tankers. They would place steam hoses in the tankers, open the valves at the top and bottom of the tanker, and allow the contaminated liquid to run onto the ground. Mr. Johnson stated that this

activity occurred several times a week, and sometimes nightly.

Akzo contends that, assuming liquids which contained hazardous substances were released on a road behind the One–Line Road facility, there is no environmental harm at the location of the alleged release. The court disagrees. According to the maps in the affidavits of Mr. Reed and Mr. Rosasco, the road where the releases allegedly occurred touches upon an area of soil and groundwater contamination. Moreover, the area where the storage tanks were cleaned is also near soil and groundwater contamination.

There is a question of fact as to whether the used solvent that Akzo and O'Brien sent to the Two–Line Road facility was released at the One–Line Road facility; accordingly, summary judgment is not appropriate.

4.

■ *National Products Facility (Study Area D)*. The National Products facility is a cluster of buildings located at the north end of One–Line Road, half a mile from the Two–Line Road plant. The National Products facility contains groundwater contamination, which is to be remediated by extraction and treatment and the installation of a new well. Akzo and O'Brien contend that they did not cause or contribute to the harm at the National Products facility.

On November 11 or 17, 1987, National Products Company discharged approximately 5,000 gallons of wastewater containing VOCs into the ground. Apparently, there were other similar discharges throughout the fall of 1987. The VOCs in the National Products' discharges are similar to the compounds now found in the groundwater. A water supply well within approximately 500 feet of the National Products facility, *see* RI Report Fig. 4.5–2, Plaintiff's app., p. 20, was free of VOCs on June 27, 1987, but found to be contaminated with VOCs in March 1988.[8] Thus, Akzo

and O'Brien contend that the only reasonable inference which can be drawn is that National Products' discharges in the fall of 1987 contaminated the groundwater in the area.

The RD/RA Settling Defendants submit evidence that labelled and unlabelled drums containing hazardous waste from the Two–Line Road facility were observed on National Products' premises in September 1983, and that releases of hazardous waste were observed from these in the vicinity of these drums. Mr. Riley testified that Fisher–Calo used the National Products premises to recondition drums.[9]

The RD/RA Settling Defendants have submitted no evidence that the drums stored at the Nation Products facility were attributable to Akzo or O'Brien, that the drums contained any waste connected with paint, or that the drums caused the groundwater contamination near the National Products facility. The drums were at the facility in 1983, yet a test of a well very near the facility four years later indicated that the groundwater was not contaminated. After National Products discharged thousands of gallons of waste onto the ground, the well first showed signs of contamination. The only reasonable inference that can be drawn is that the discharge by National Products caused the groundwater contamination at the National Products facility.

Accordingly, the plaintiffs' motion for summary judgment must be granted with respect to the groundwater contamination at the National Products facility.

5.

■ *Space Leasing Facility (Study Area E)*. The Space Leasing Facility is two miles east of the Two Line facility, and contains an area of soil contamination caused by the burial of drums and releases of hazardous materials which occurred before Akzo and O'Brien shipped their products to the Two Line Road.

---

8. The well, however, does not appear to be within the area of groundwater contamination at issue in this case. *See* RI Report Fig. 4.5–2, Plaintiff's app., p. 20.

9. The confidential informant told Sgt. Ludlow that in 1983 drums which were rusty, leaky, and disintegrating were taken from the Two–Line Road premises to the National Products facility. As stated above, however, Sgt. Ludlow's testimony with respect to what he was told by the confidential informant about the Site is not admissible under Rule 803(24) or 804(b)(5).

In 1974, an Fisher–Calo contractor moved about 1,000 drums of hazardous waste from the One–Line facility to the Space Leasing facility. The drums then were used as fill in constructing a loading ramp at the Space Leasing buildings. The contractor punctured the drums, resulting in their contents being released into the soil. Akzo and O'Brien contend that no other substances were released at the Space Leasing facility. Akzo and O'Brien maintain that they are not liable for remediation at the Space Leasing facility because their products were not delivered to FCC until 1981, and were never present at the Space Leasing facility.

The RD/RA Settling Defendants claim that between 1981 and 1985, waste materials sent to the Two–Line Road premises were moved to all other locations at the site, including the Space Leasing facility. The court, however, has reviewed the evidence presented by the RD/RA Settling Defendants, *see* RD/RA Settling Defendants Response to Plaintiffs' Cross–Motion for Summary Judgment, pp. 23–48, and could find no references to releases occurring at the Space Lease facility between 1981 and 1985.

Accordingly, the court must grant the plaintiffs' motion for summary judgment with respect to the Space Leasing facility.

### VI.

In conclusion, the court:

(1) GRANTS the RD/RA Settling Defendants' motion for leave to file a statement of genuine issues instanter (filed January 7, 1994 (# 197));

(2) DENIES the RD/RA Settling Defendants' motion for partial summary judgment on Count 1 as to liability (filed September 8, 1992 (# 103)); and

(3) GRANTS IN PART AND DENIES IN PART the plaintiffs' motion for summary judgment (filed July 30, 1993 (# 171)) as follows:

(a) with respect to the Two–Line Road facility, the court GRANTS the plaintiffs' motion regarding the 500 cubic yard pocket of soil contaminated with PCBs, and DENIES the plaintiffs' motion regarding the 12,600 cubic yard

mound of contaminated soil and the contaminated groundwater;

(b) with respect to the New Plant Life facility, the court GRANTS the plaintiffs' motion regarding the 500 cubic yard pocket of soil contaminated with PCBs, and DENIES the motion regarding the 7,000 cubic yard pocket of contaminated soil;

(c) with respect to the One–Line Road facility, the court DENIES the plaintiffs' motion;

(d) with respect to the National Products facility, the court GRANTS the plaintiffs' motion; and

(e) with respect to the Space Leasing facility, the court GRANTS the plaintiffs' motion.

SO ORDERED.